MICHIGAN RAILROAD COMMISSION *v.* MICHIGAN CENTRAL RAILROAD CO.

1. CONSTITUTIONAL LAW — INTERSTATE COMMERCE — MICHIGAN RAILROAD COMMISSION—INTERCHANGE OF CARS.

An order of the Michigan railroad commission requiring the Michigan Central Railroad, a steam road, and the Detroit United Railway, an electric railway, to install a connecting track between the two roads in the village of Oxford, Michigan, and to interchange freight cars and passenger traffic, is not in violation of the commerce clause of the Federal Constitution (Art. 1, sec. 8, subd. 3), since the order must be deemed to affect only intrastate traffic, which is within the jurisdiction of the commission. (Act No. 312, Pub. Acts 1907; Act No. 300, Pub. Acts 1909.)

2. SAME—DUE PROCESS OF LAW.

Said act creating the commission and authorizing it to act in such cases does not deprive respondent of its property without due process of law; subdivision *c* of section 7 containing a provision for reasonable compensation to the carrier.

3. SAME—EQUITY JURISDICTION—MANDAMUS.

The questions of the practicability of the physical connection and interchange of traffic and of the reasonableness of the service being reviewable only by proceedings in chancery under section 26, Act No. 312, Pub. Acts 1907, are not open for determination in mandamus to compel the carrier to conform to the order of the Michigan railroad commission.

Mandamus by the Michigan railroad commission against the Michigan Central Railroad Company to compel the interchange of traffic between respondent and the Detroit United Railway, under an order of the commission. Submitted April 20, 1911. (Calendar No. 24,103.) Writ granted November 3, 1911. Rehearing denied March 30, 1912.

*Franz C. Kuhn,* Attorney General, and *George S. Law,* Assistant Attorney General, for relator.

*Frank E. Robson* (*Henry Russel,* of counsel), for respondent.

BLAIR, J. Relator asks for a writ of mandamus to compel respondent to comply with its order—

"For the reasons set forth more fully in the opinion of the commission this day filed, that the said Michigan Central Railroad Company and the said Detroit United Railway Company, on or before the 15th day of August, A. D. 1908, connect their tracks at such point in the said village of Oxford, Oakland county, as they shall between themselves agree upon as most desirable, and thereafter there interchange cars, car load shipments, less than car load shipments and passenger traffic in accordance with the provisions of section 7 of Act 312 of the Public Acts of 1907.

"It is further ordered that the said defendants shall, on or before the 1st day of July, A. D. 1908, designate the point at which·such physical connection shall be made and notify the said commission of such designation, and that if the said defendants are unable to agree as to the said point then the said commission shall, on or after the said 1st day of July, make a supplemental order herein, determining the location of said connection."

The Michigan Central Railroad Company operates the Detroit & Bay City Railroad as lessee. The line of the Detroit & Bay City Railroad extends from the city of Detroit, in the county of Wayne, to the city of Bay City, in the county of Bay, passing through the village of Oxford, in the county of Oakland. The Detroit United Railway Company, a corporation organized and existing under the street railway act (chapter 168, 2 Comp. Laws), operates an interurban railway extending from the city of Detroit to the city of Flint, and likewise passing through the village of Oxford, in the county of Oakland. Between the village of Oxford and the city of Flint, the railroad of the Detroit United Railway passes through the village of Ortonville, in the county of Oakland, and the villages of Goodrich and Atlas, in the county of Genesee. Ortonville is 10 miles from Oxford; Goodrich is 16 miles from Oxford; and Atlas is 18 miles from Oxford. The only railroad facilities at Ortonville, Goodrich, and Atlas are such as are afforded by the Detroit United Railway.

The Detroit United Railway is operated entirely by electric motive power, while the Michigan Central Railroad is operated by steam power. Shipments of freight to or from points on the Detroit United Railway between Oxford and Flint are required to be transferred from the steam railroad cars of the Michigan Central to the cars of the Detroit United Railway, and transported by the Detroit United Railway to their destination.

In January, 1908, certain residents of Ortonville and also of Goodrich filed with the Michigan railroad commission a complaint against the Michigan Central Railroad Company and the Detroit United Railway Company, asking in substance that an order be made by the commission requiring the Michigan Central Railroad Company and the Detroit United Railway Company to make a physical connection of their railroad tracks in the village of Oxford, and to there interchange cars, car load shipments, etc., in accordance with the provisions of subdivision "b" of section 7, Act No. 312, Pub. Acts 1907. April 28, 1908, a hearing was had before the commission, after due notice to the railroad companies, at which the railroad companies appeared and were represented by counsel, and a full hearing had bearing upon the matters complained of in said petitions. On June 5, 1908, the commission filed an opinion in said cause, and upon the same day made the order above referred to. The companies not having designated the point at which the physical connection of their tracks was to be made, the commission, on the 27th of November, 1908, made a supplemental order designating the point at which such physical connection should be made, and extending the time for the installation of the same to December 11, 1908. The physical connection between the tracks of said railroad companies was thereafter installed as ordered by said commission, and is still maintained by said railroad companies, although respondent performed its part under protest.

The orders made by the Michigan railroad commission were duly served upon the Michigan Central Railroad

Company and the Detroit United Railway Company, as required by law, and neither of said companies instituted any proceeding to test the validity of said orders within the time limited therefor by section 26, Act No. 312, Pub. Acts 1907. The Detroit United Railway Company is willing and able to accept cars and car loads of freight from the Michigan Central Railroad Company to be delivered along the line of the Detroit United Railway between the village of Oxford and the city of Flint. The Michigan Central Railroad Company, however, has hitherto refused, and still refuses, to deliver cars and car loads of freight to the Detroit United Railway Company for transportation to the points on the Detroit United Railway between Oxford and Flint.

The original act creating the Michigan railroad commission is Act No. 312, Pub. Acts 1907, entitled:

"An act to regulate railroads and the transportation of persons and property in this State, prevent the imposition of unreasonable rates, prevent unjust discrimination, insure adequate service, create the Michigan railroad commission, define the powers and duties thereof, and to prescribe penalties for violations hereof."

Subdivision "*d*" of section 3 of said act provides that "the term 'railroad' as used in this act shall be construed to include both steam and electric railroads," etc. Subdivision "*b*" of section 7 of said act, under which the orders in this case were made, provides as follows:

"Where it is practicable and the same may be accomplished without endangering the equipment, tracks, or appliances of either party, the commission may, upon application, require steam railroads and interurban and suburban railroads to interchange cars, car load shipments, less than car load shipments, and passenger traffic, and for that purpose may require the construction of physical connections upon such terms as it may determine: *Provided,* that nothing in this act shall be construed to require through billing of freight as between steam and electric, suburban or interurban railroads, but such suburban and interurban railroads may be used for the handling of freight in car load lots in steam railroad freight

cars between shippers or consignees and the steam railroads, in the same manner and under the same general conditions, except as to motive power, as belt line railroads and terminal railroads are now or may hereafter be used for like purposes."

Subdivision " *c* " of the same section provides:

" Every corporation owning a railroad in use shall, at reasonable times and for a reasonable compensation, draw over the same the merchandise and cars of any other corporation or individual having connecting tracks: *Provided*, such cars are of the proper gauge, are in good running order and equipped as required by law and otherwise safe for transportation and properly loaded; *provided further*, if the corporations cannot agree upon the times at which the cars shall be drawn, or the compensation to be paid, the said commission shall, upon petition of either party and notice, to the other, after hearing the parties interested, determine the rate of compensation and fix such other periods, having reference to the convenience and interests of the corporation or corporations, and the public to be accommodated thereby, and the award of the commission shall be binding upon the respective corporations interested therein until the same shall have been revised. Any railroad corporation refusing to comply with the provisions of this section shall be liable to a penalty not exceeding five hundred dollars."

Sections 25 and 26 read as follows:

" SEC. 25. All rates, fares, charges, classifications and joint rates fixed by the commission and all regulations, practices and services prescribed by the commission shall be in force and shall be *prima facie* lawful and reasonable until finally found otherwise in an action brought for the purpose pursuant to the provisions of section twenty-six of this act, or until changed or modified by the commission as provided for in paragraph ( *b* ), section twenty-four of this act.

" SEC. 26. ( *a* ) Any railroad or other party in interest, being dissatisfied with any order of the commission fixing any rate or rates, fares, charges, classifications, joint rate or rates, or any order fixing any regulations, practices or services, may within sixty days commence an action in the circuit court in chancery against the commission as defendant to vacate and set aside any such order on the

ground that the rate or rates, fares, charges, classifications, joint rate or rates fixed is unlawful or unreasonable, or that any such regulation, practice or service fixed in such order is unreasonable; in which suit the commission shall be served with a subpœna. The commission shall file its answer, and on leave of court any interested party may file an answer to said complaint, whereupon said action shall be at issue and stand ready for hearing upon ten days' notice by either party. All suits brought under this section shall have precedence over any civil cause of a different nature pending in such court, and the circuit court shall always be deemed open for the hearing thereof, and the same shall proceed, be tried and determined as other chancery suits. Any party to such suit may introduce original evidence in addition to the transcript of evidence offered to said commission, and the circuit courts in chancery are hereby given jurisdiction of such suits and empowered to affirm, vacate or set aside the order of the commission in whole or in part, and to make such other order or decree as the courts shall decide to be in accordance with the facts and the law."

Respondent claims a mandamus should not issue because:

" (1) The Detroit United Railway Company is a 'street railway,' and not authorized by the act under which it is organized to do a 'railroad' business and transport over its lines freight and freight cars of the character transported by respondent, and it cannot be authorized so to do by the municipalities through which its lines pass, nor by the action of relator.

" (2) And therefore it is not competent to enter into any contract, agreement, or arrangement for that purpose with respondent.

" (3) Nor is it, in fact, possessed of cars, equipment, tracks, or other facilities sufficient to handle such freight and freight cars, or with which to make the interchange of business required by the order of relator.

" (4) Respondent cannot without breach of contract interchange with the Detroit United Railway Company cars in its possession belonging to foreign or other corporations.

" (5) The order of said commission and the statutes purporting to authorize it violate section 16, art. 2, of the Constitution of the State of Michigan (and as well section 32 of article 6 of the Constitution of 1850), and the four-

teenth amendment to the Constitution of the United
States, in that the enforcement of said order and statutes
would deprive respondent of its property without due pro-
cess of law.

" (6) Said order and said statutes are an attempt to
regulate and impose a burden upon interstate commerce,
and violate section 8 of article 1 of the Federal Constitu-
tion, vesting in Congress the power to regulate interstate
commerce."

The opinion of the commission, after determining the
practicability of the physical connection and of inter-
change, and reciting the testimony and other facts, pro-
ceeds as follows:

"Reasonableness of Requiring Interchange. The evi-
dence in this case amply sustains the allegations of com-
plainants in these cases that interchange between the elec-
tric and steam lines at the points in question would result
in very substantial benefits to these villages and the sur-
rounding communities. It is shown that 50 cents less per
ton is paid for hay at Ortonville than at the neighboring
town of Grand Blanc. Fifty cents more is charged per ton
for coal at Ortonville than at Oxford, and these differences
in price are due to the expense incurred in the transfer at
Oxford of said commodities from the cars of the steam line
to those of the electric. Stock for shipment must be
driven to Thomas, Davison, and other points. Elevator
facilities have not been provided at Goodrich or Orton-
ville because of lack of shipping facilities. As to de-
fendant Michigan Central Railroad Company, small sac-
rifice is asked in order to secure to these people the bene-
fits they ask. It will have to expend its proportion of the
amount necessary to install the connection, but no further
expenditure is involved for it. Were the contemplated
elevator at Goodrich one to be established at Oxford on
the line of the Michigan Central, or at Flint on the 'cut-
off' of the Grand Trunk, side track facilities would be
provided for it by that company, in view of the business
to be derived. The business to be derived by the steam
railroad company from Ortonville, Goodrich and sur-
rounding country, via these connections and the Detroit
United Railway, gives promise of being considerable
in amount. Thereby it is believed the Michigan Central
Railroad Company and the Grand Trunk Western Rail-

way Company will be the beneficiaries by sucn connections."

It is apparent that the statute expressly authorized the order made, and, the respondent having failed to institute proceedings for a review of the order, the questions of the practicability of the physical connection and of the interchange of traffic, as well as the reasonableness of the service required, are not open in this proceeding. We therefore consider only the constitutional questions presented.

Does the order violate the commerce clause of the Constitution? As we have heretofore held, the jurisdiction of the commission is limited to intrastate traffic, and its order in the present case must be deemed to be so limited. *Ann Arbor R. Co.* v. *Railroad Commission*, 163 Mich. 49 (127 N. W. 746). See, also, *Wisconsin, etc., R. Co.* v. *Jacobson*, 179 U. S. 287 (21 Sup. Ct. 115); *Pittsburg, etc., R. Co.* v. *Railroad Commission*, 171 Ind. 189 (86 N. E. 328).

Does the order deprive respondent of its property without due process of law? For the affirmance of the proposition that it does, respondent relies upon *Central Stock Yards Co.* v. *Railway Co.*, 192 U. S. 568 (24 Sup. Ct. 339), and *Louisville, etc., R. Co.* v. *Stock Yards Co.*, 212 U. S. 132 (29 Sup. Ct. 246). In our opinion, the present case is distinguishable from, and not ruled by, the cases cited, for the reasons that the statute expressly imposes upon respondent an obligation to interchange cars, etc., and subdivision "c" of section 7 above quoted expressly provides for reasonable compensation.

We therefore hold the statute to be constitutional, and the writ will issue as prayed.

STEERE, MOORE, McALVAY, BROOKE, and STONE, JJ., concurred with BLAIR, J.

OSTRANDER, C. J. I am of opinion that the act in question may be so construed that it will be constitu-

tional. In so far as he considers the grounds upon which the validity of the law is attacked, I agree with Mr. Justice BLAIR. While I doubt the propriety of declaring the law to be constitutional before, and apart from, determining the meaning of some of its provisions, I am willing to assent to the granting of an order requiring respondent to conform to the order made by the commission.

BIRD, J., did not sit.